* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman, with modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are subject to the Workers' Compensation Act.
2. The date of the alleged injury is January 20, 2004.
3. The employer and employee relationship existed between the plaintiff and the defendant-employer on January 20, 2004.
4. The defendant-carrier, The Phoenix Insurance Company, a subsidiary of St. Paul Travelers, was the carrier on the risk on January 20, 2004.
5. The Form 22 completed in the matter computes to an average weekly wage of $942.18, which would yield a compensation rate of $628.12.
6. The plaintiff received 26 weeks of short-term disability (STD) benefits at the gross rate of $421.20 beginning January 21, 2004. Said STD plan was fully funded by the defendant-employer.
7. The plaintiff began receiving long-term disability (LTD) benefits under a plan through Getrag Corporation on July 28, 2004, at the rate of $1,825.20 per month. Said benefits were continuing as of the date of hearing before the Deputy Commissioner. The LTD plan is also fully funded by the employer.
8. In addition, the parties stipulated into evidence the following:
a. Packet of medical records and reports;
 b. The defendants' responses to the plaintiff's discovery requests;
 c. The plaintiff's responses to the defendants' discovery requests;
d. Transcript of recorded statement; and,
e. Additional medical records submitted June 3, 2005.
9. The Pre-Trial Agreement dated January 11, 2005, which was submitted by the parties, is incorporated by reference.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was forty-eight years old at the time of hearing before the Deputy Commissioner. He completed the eleventh grade and obtained his GED while in the Army. He subsequently attended trade school and took courses at the local community college. On January 2, 1990, he began working for the defendant-employer, a company which manufactured gears for the automotive industry. His job was heat treat operator, a position that involved loading racks of gears into furnaces, monitoring the furnaces during the heat treat process, and then unloading the racks. The loaded racks were quite heavy, but they had wheels so that they could be rolled from the loading table onto a loading cart and from the loading cart into the furnace. The plaintiff was not required to lift the racks.
2. Prior to the alleged injury at work, the plaintiff had had a long history of neck problems for which he did not seek medical treatment for years. In August 2003, the plaintiff injured his neck while working on his truck at home and sought treatment from Dr. Peltzer, his family doctor. Dr. Peltzer treated the plaintiff with medication, including narcotic pain medication, and gave him work restrictions. Because the defendant-employer did not have light-duty work available at that time, the plaintiff went on a medical leave of absence.
3. The plaintiff's symptoms persisted, so he subsequently went to Dr. Sarzier, a neurosurgeon, who examined him on October 2, 2003. At that time, the plaintiff reported his neck pain as a seven to eight out of a ten-point scale, with the pain occasionally going to his left shoulder and mid arm and all the way down his spine. An MRI revealed osteophytes at multiple levels on both sides of his cervical spine as well as some degenerative disc disease. Dr. Sarzier recommended conservative treatment with epidural steroid injections. Dr. Dawson, a pain management specialist, performed the injections and they provided relief for short periods of time. However, the plaintiff indicated that the pain would return after a period of time.
4. At the first office visit with Dr. Sarzier, the plaintiff also described chronic problems with low back pain that bothered him when he bent forward even slightly. The pain radiated to his right hip and thigh. The doctor did not provide separate treatment for the low back symptoms.
5. After seeing Dr. Sarzier, the plaintiff began to misuse narcotic pain medication. He received prescriptions from both Dr. Peltzer and Dr. Sarzier, and later obtained prescriptions from Dr. Dawson, as well. By December, Dr. Peltzer had become suspicious of drug-seeking behavior and he stopped writing the plaintiff prescriptions for a period of time. Dr. Dawson apparently made the plaintiff sign an agreement regarding narcotic use and on December 10, 2003, advised him that he needed to reduce the amount of medication he was taking. The doctor subsequently learned that the plaintiff had been taking more medication than he had prescribed, so on December 31, 2003, Dr. Dawson advised the plaintiff that he would not prescribe further narcotics without first getting a drug screen. The plaintiff decided to terminate his care with Dr. Dawson.
6. That same day, the plaintiff went to Newton Family Physicians and saw Dr. Lopina instead of Dr. Peltzer. He told Dr. Lopina that his neck and left shoulder pain had become worse for several days, that he could not afford surgery and that he needed something for pain. Dr. Lopina gave him a Toradol injection and a steroid dose pack, but instructed him to return to Dr. Sarzier or Dr. Dawson for further pain management.
7. Two days later, the plaintiff filled a prescription with Codeine from Dr. Michael Reott, who was not known to be treating the plaintiff. On January 7, 2004, the plaintiff returned to Dr. Peltzer advising that Dr. Sarzier was leaning toward surgery and indicated that he would like a second opinion. In fact, the plaintiff had not seen Dr. Sarzier since November 20, 2003, and Dr. Sarzier had recommended another epidural steroid injection at that time. Dr. Peltzer agreed to make the referral and prescribed more narcotic pain medication in the interim.
8. By that time, the plaintiff had no other physicians prescribing narcotic pain medication for him.
9. The plaintiff retuned to work from his medical leave of absence on December 8, 2003. His supervisor assigned him to the old heat treat area, where the work was less strenuous, and sent Nicki Laudermilk to the new heat treat area to operate the furnace there.
10. The plaintiff has alleged that on January 20, 2004, he injured his neck and low back while pulling a rack of gears from a loading table to a cart. Contrary to his testimony, the plaintiff was sent to the office early that day to review test scores from some aptitude testing he had taken as part of the application process for a new position with the company. He was sent to the office because work was very slow that day and he was not needed at his work station for production purposes. Despite checking his work area several times afterwards, his supervisor never saw the plaintiff back at his work station.
11. While in the office, the plaintiff learned that he had done rather poorly on the aptitude testing. He expressed frustration because he believed that he should be given the position he wanted based solely on his seniority and he was convinced that his test results would keep him from getting the job. Even though the testing was required of all applicants, he thought it was unfair to him. During the discussion, the plaintiff got up and down from his chair as though he was uncomfortable and complained of pain. However, he never said anything about having been injured at work.
12. After leaving the office, it is unknown whether the plaintiff actually resumed his work activities. Within a short period of time, he did tell Ms. Laudermilk that he had been hurt at work, but he left work without telling his supervisor, Jack Growchowski, which was contrary to company policy. Mr. Growchowski learned of the plaintiff's alleged injury from Ms. Laudermilk. Consequently, arrangements were made the next day to send the plaintiff to Maiden Family Practice. On January 21, 2004, the plaintiff saw Cindy Pressler, a physician's assistant with Maiden Family Practice, who noted that the plaintiff seemed agitated and stated that he had been forced to come there by his employer. In addition to describing an injury at work pulling a rack of gears, the plaintiff told her that he had prior neck problems but was vague when questioned about prior treatment. When she recommended referral to Dr. Hanson's pain clinic for the alleged injury, he refused to go and claimed that the doctor had "an attitude."
13. Ms. Pressler prescribed medication for the plaintiff, including narcotic pain medicine. The next day, the plaintiff called and got a prescription for a narcotic from Dr. Peltzer, who was unaware of the prescription by Ms. Pressler. The plaintiff returned to Dr. Peltzer on January 27, 2004. The plaintiff reported that he had not sought a second opinion evaluation regarding surgery, as recommended by Dr. Peltzer, because he could not afford the deductible because of a new insurance plan; that he seemed to have done something at work when he twisted and felt low back pain; that he had continued working and later pulled on something with a crow bar and had pain in the right side of his neck, with numbness in both hands and the toes of his right foot; and that he wanted a referral back to Dr. Sarzier for treatment. Dr. Peltzer prescribed more narcotic pain medication for the plaintiff and made the referral. The plaintiff called for additional medication on February 2, 9, 13, and 27, 2004 and was given prescriptions on those dates. He saw Dr. Sarzier on March 2, 2004, and began receiving prescriptions from the neurosurgeon, as well. However, Dr. Sarzier wanted the plaintiff to return to Dr. Dawson for conservative treatment, including pain medication. The doctor was unaware that the plaintiff had previously been discharged from Dr. Dawson's care for the narcotics contract violation.
14. After multiple rescheduled appointments, the plaintiff ultimately saw Dr. Miller, another pain specialist, on April 8, 2004, at the referral of Ms. Pressler. Dr. Miller advised him that the amount of Vicodin he had been taking was toxic to his liver. Nevertheless, it was unlikely that the plaintiff had revealed the full extent of his use of narcotic and pain medication. Prior to this appointment, the plaintiff had had filled prescriptions from Dr. Pressler, Dr. Sarzier, and from the emergency room, using different pharmacies. Although Dr. Miller gave him instructions on the amount of medication he was to take, the doctor nevertheless gave him another prescription.
15. Dr. Geiselle, an orthopedic surgeon, subsequently assumed the plaintiff's care. He ultimately performed surgery to plaintiff's lumbar spine on November 1, 2004, to decompress and fuse the L2-3 and L5-S1 interspaces.
16. Although the plaintiff has presented medical evidence attributing his neck and low back conditions to an incident at work on January 20, 2004, the Full Commission finds that the doctors relied upon the inaccurate history he gave them in forming their opinions. It is clear from the record that many of the plaintiff's attempts to seek medical care for his back were in actuality drug seeking endeavors because of his dependence upon narcotic pain medication. As to the plaintiff's description of the events at work on January 20, 2004, the alleged date of injury, the evidence fails to support that any incident occurred that day. The plaintiff left his workstation early that day to review his aptitude test scores for a possible promotion, and did not make any mention of an injury to his supervisors or co-workers until learning of his poor test scores. In reviewing the totality of the evidence of record, the Full Commission finds there to be several inconsistencies between the plaintiff's behavior and testimony as compared to the credible evidence of record. The Full Commission finds that the plaintiff's account of his alleged incident at work on January 20, 2004, is not supported by the credible evidence of record. Thus, the Full Commission finds that the plaintiff failed to prove that he sustained a neck or back injury on January 20, 2004, as the result of a specific traumatic incident of the work assigned, or an injury by accident arising out of and in the course of his employment.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff failed to prove that he sustained an injury by accident arising out of and in the course of his employment or a specific traumatic incident of the work assigned with defendant-employer on January 20, 2004. N.C. Gen. Stat. §97-2(6); Anderson v. Northwestern Motor Company, 233 N.C. 372
(1951).
2. The plaintiff is not entitled to benefits under the Workers' Compensation Act for his neck and back conditions. N.C. Gen. Stat. § 97-2 et seq.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits must be, and is hereby, DENIED.
2. Each side shall pay its own costs.
This 24th day of February 2006.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER